# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| U.S. WATER SERVICES, INC., and ROY JOHNSON,<br><br>                Plaintiffs,<br><br>    v.<br><br>NOVOZYMES A/S and NOVOZYMES NORTH AMERICA, INC.,<br><br>                Defendants. | Case No. 3:13-cv-00864-jdp |

# NOVOZYMES' RENEWED RULE 50(a) MOTION FOR
# JUDGMENT OF NON-INFRINGEMENT AS A MATTER OF LAW

**TABLE OF CONTENTS**

                                                                                          **Page**

I.      INTRODUCTION ..................................................................................................... 1

II.     NOVOZYMES IS ENTITLED TO JUDGMENT OF NON-INFRINGEMENT
        AS A MATTER OF LAW ......................................................................................... 1

        A.      Legal Standard ............................................................................................... 1

        B.      U.S. Water Failed to Establish Direct Infringement as to Most Novozymes
                Phytaflow® Customers ................................................................................... 2

                1.      U.S. Water Introduced No Evidence of Direct Infringement for the
                        Unnamed Plants, or that the Named Plants are "Representative" .............. 3

                2.      U.S. Water Has Not Proved Direct Infringement by Any of the
                        Named Plants ............................................................................................ 6

                        a.      U.S. Water relies on plant data that pre-dates the issuance
                                of the asserted patents ...................................................................... 6

                        b.      Calgren and Dakota Ethanol do not practice the "pH 4.5 or
                                higher" limitation ............................................................................. 8

                        c.      None of the named plants meets the "substantially without
                                acid" limitation ................................................................................ 9

        C.      U.S. Water Failed to Establish that Novozymes Induces Infringement of
                the Asserted Claims Under 35 U.S.C. § 271(b) ..................................................... 11

        D.      U.S. Water Has Not Proved that Novozymes Contributes to Infringement
                of the Asserted Claims Under 35 U.S.C. § 271(c) ............................................... 17

                1.      The Phytase Formulation Sold by Novozymes Is a Staple Article of
                        Commerce with Substantial Noninfringing Uses ...................................... 17

                2.      U.S. Water Has Failed to Prove Specific Intent to Contribute to
                        Infringement or that Novozymes Knew Its Customers Were
                        Infringing .................................................................................................. 23

III.    CONCLUSION ......................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*,
  501 F.3d 1307 (Fed. Cir. 2007)................................................................2, 3, 6

*Akamai Tech., Inc. v. Limelight Networks, Inc.*,
  692 F.3d 1301 (Fed. Cir. 2012) *rev'd on other grounds*, 134 S. Ct. 2111............................20

*C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*,
  911 F.2d 670 (Fed. Cir. 1990)...............................................................19

*Commil USA, LLC v. Cisco Sys., Inc.*,
  __ U.S. __,135 S. Ct. 1920 (2015)..........................................................11, 23

*Dawson Chem. Co. v. Rohm and Haas Co.*,
  448 U.S. 176 (1980)........................................................................20

*Dynacore Holdings Corp. v. U.S. Phillips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004)...........................................................2, 3, 4

*Fujitsu Ltd. v. Netgear Inc.*,
  620 F.3d 1321 (Fed. Cir. 2010)............................................................17

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011)....................................................................11, 15, 20

*Hall v. Forest River, Inc.*,
  536 F.3d 615 (7th Cir. 2008) .................................................................1

*Health Grades, Inc. v. MDX Med., Inc.*,
  No. 11-CV-00520- RM-BNB, 2014 WL 5762002 (D. Colo. Nov. 4, 2014)..........................16

*Hewlett Packard Co. v. Bausch & Lomb Inc.*,
  909 F.2d 1464 (Fed. Cir. 1990)............................................................22

*Hodosh v. Block Drug Co.*,
  833 F.2d 1575 (Fed. Cir. 1987)..........................................................17, 19

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
  681 F.3d 1323 (Fed. Cir. 2012).......................................................18, 21, 22

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
  __ U.S. __, 134 S. Ct. 2111 (2014).......................................................2, 12

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)...........................................................................3, 4

*MercExchange, LLC v. eBay, Inc.*,
  401 F.3d 1323 (Fed. Cir. 2005), *vacated and remanded on other grounds*,
  547 U.S. 388 (2006).........................................................................................12, 13

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)....................................................................................20, 21, 22

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002)..............................................................................11

*Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*,
  265 F.3d 601 (7th Cir. 2001) ....................................................................................2

*Nat'l Presto Indus., Inc. v. W. Bend Co.*,
  76 F.3d 1185 (Fed. Cir. 1996)................................................................................16

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
  491 F.3d 1342 (Fed. Cir. 2007)..............................................................................20

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*,
  172 F.3d 836 (Fed. Cir. 1999)..................................................................................2

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)................................................................................................20

*State Indus., Inc. v. A.O. Smith Corp.*,
  751 F.2d 1226 (Fed. Cir. 1985)..............................................................................16

*Tyco Healthcare Grp. LP v. Biolitec, Inc.*,
  No. C-08-3129 MMC, 2010 WL 3185497 (N.D. Cal. Aug. 11, 2010) ............19, 22

*Universal Elec., Inc. v. Zenith Elec. Corp.*,
  846 F. Supp. 641 (N.D. Ill. 1994) ..........................................................................19

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

**STATUTES AND RULES**

35 U.S.C. § 271(b) ............................................................................................ *passim*

35 U.S.C. § 271(c) .......................................................................................17, 19, 20, 22

Federal Rule of Civil Procedure 50 .............................................................................1, 2

I.      **INTRODUCTION**

Pursuant to Rule 50(a), defendants Novozymes A/S and Novozymes North America, Inc. (collectively, "Novozymes") renew their motion for judgment as a matter of law of non-infringement (Dkt. No. 753).

II.     **NOVOZYMES IS ENTITLED TO JUDGMENT OF NON-INFRINGEMENT AS A MATTER OF LAW**

The Court should enter judgment as a matter of law as to U.S. Water's claims that Novozymes contributes to and induces its customers' direct infringement of U.S. Water's patents because U.S. Water offered insufficient evidence on three issues: (1) no evidence in the record supports U.S. Water's contention that the few plants for which it has obtained data practice all of the limitations of any asserted claim of the '137 patent or the '399 patent; (2) no evidence in the record supports U.S. Water's contention that direct infringement by the few plants for which evidence was provided may be extrapolated to all Novozymes Phytaflow® customers; and (3) no evidence in the record supports U.S. Water's contention that Novozymes induced or contributed to any customer's direct infringement.

A.      **Legal Standard**

Federal Rule of Civil Procedure 50(a)(1) provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

The Seventh Circuit has explained that the question under Rule 50(a)(1) "is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the [nonmoving party]." *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008). A "mere scintilla" of evidence is not

sufficient to survive a Rule 50 motion; there must be "substantial evidence" that "would have permitted the jury to find in the [nonmoving party]'s favor." *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 612 (7th Cir. 2001).

### B.   U.S. Water Failed to Establish Direct Infringement as to Most Novozymes Phytaflow® Customers

U.S. Water charges that Novozymes induces and contributes to direct infringement by its Phytaflow® customers.  But liability for indirect infringement must be predicated on proof of direct infringement, and thus Novozymes cannot be liable for indirect infringement in any instance where there is no direct infringement.  *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, __ U.S. __, 134 S. Ct. 2111, 2117 (2014) ("[W]here there has been no direct infringement, there can be no inducement of infringement under § 271(b).").  To prove infringement, U.S. Water is required to show that the accused method of using Phytaflow® practices every limitation of the asserted claims.  *See Seal-Flex, Inc. v. Athletic Track & Court Constr.,* 172 F.3d 836, 842 (Fed. Cir. 1999).  U.S. Water must point to and prove specific instances of direct infringement by *each* of Novozymes' customers.  *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004) ("A defendant's liability for indirect infringement must relate to the identified instances of direct infringement."); *ACCO Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) ("a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit").

### 1.   U.S. Water Introduced No Evidence of Direct Infringement for the Unnamed Plants, or that the Named Plants are "Representative"

U.S. Water offered evidence of direct infringement for only eight fuel ethanol plants to which Novozymes sold Phytaflow®.[1]  Trial Tr. (Oct. 11, 2017 pm) (rough) at 41:13–15; Trial Tr. (Oct. 12, 2017 am) (rough) at 6:3–10.  Neither U.S. Water's technical expert, Eric Dorn, nor any other witness testified that the eight named plants are "representative" of others.  Mr. Dorn admitted that he did not select the eight plants he considered, and that he had no knowledge of how they were chosen.  Trial Tr. (Oct. 12, 2017 am) (rough) at 21:10–16.

Without actual evidence of infringing use by any specific unnamed plant, infringement cannot merely be assumed.  *See ACCO Brands, Inc.*, 501 F.3d at 1313 (affirming finding of insufficient evidence of direct infringement to support a jury finding of [indirect] infringement where "the record contains no evidence of actual users having operated the [accused product] in an infringing manner" and expert testimony inferring infringing use was undermined by evidence that "the accused device does not necessarily infringe the [asserted] patent").  Moreover, this case is distinguishable from those where "little, if any, direct evidence of infringement" sufficed to support a finding of indirect infringement of a method patent.

For example, in *Lucent*, the patentee alleged indirect infringement based on the sales and use of Microsoft Money, Microsoft Outlook, and Windows Mobile, where approximately 110 million units of the software products were capable of practicing the methods of the asserted claims.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317, 1323 (Fed. Cir. 2009) (rejecting Microsoft's argument that "[u]nder *Dynacore*, Lucent had to tie its damages claim to

---

[1] The eight plants are: Kansas Ethanol; Southwest Georgia Ethanol ("SWGE," now Flint Hills Resources – Camilla); Glacial Lakes Energy – Mina ("GLEM"); Glacial Lakes Energy – Watertown ("GLEW"); Dakota Ethanol; Nesika Energy; Aemetis; and Calgren Renewable Fuels.

demonstrated instances of direct infringement"). The Court found that although Lucent's evidence of direct infringement was limited, it provided enough circumstantial evidence regarding the extensive sales of the products and dissemination of instruction manuals sufficient to permit the jury to find that at least one person had performed the claimed method. *Id.* at 1317. The number of possible direct infringers in *Lucent* was immense—every user of the three software products. *Id.* Proving each act of direct infringement would have been a daunting, if not impossible task. *Id.* But because Lucent accused *particular features* of those Microsoft products, such as the "date-picker calendar tool" in Outlook, and because *any customer following Microsoft's instructions* for use of the feature *would necessarily infringe* Lucent's patent, the set of accused direct infringers was a *well-defined and uniform category* of customers. *Id.* Accordingly, because the named plants are not representative, U.S. Water was required to introduce evidence regarding each of the unnamed plants. It failed to do so. Fuel ethanol plants are not like computer programs that operate the same way for each user. While they may be similar in some respects—e.g., they all have the process steps of liquefaction, saccharification, fermentation, and distillation—the particular operating conditions vary, sometimes substantially, from plant to plant and even from time to time for the same plant. *See infra* § II.B.2. Although it is true that all plants that use phytase in fermentation experience a reduction in the formation of deposits, factors such as sulfuric acid addition and pH values in the beer column vary from plant to plant and can depend on numerous factors that are unique to a particular plant. *See, e.g.*, Trial Tr. (Oct. 16, 2017 pm) (rough) at 61:12–62:1 (Novozymes' technical expert, Dr. Scott Kohl, discusses factors that cause fuel ethanol plants to operate differently with respect to pH and sulfuric acid, including bacterial problems, pH requirements for other enzymes, and the activity level of other ingredients); Trial Tr. (Oct. 11, 2017 pm) (rough) at 39:5–11 (U.S. Water's

expert Mr. Dorn admits that there can be "changes from plant to plant," including differences

that are "pretty significant" with respect to plant design).

Indeed, U.S. Water made explicit admissions regarding the variability of operating

parameters such as sulfuric acid usage and pH within and among plants.  As to sulfuric acid

usage, U.S. Water admitted:

> [F]uel ethanol plant operators, based on their specific plant operating needs and
> procedures, may add sulfuric acid at one or more specific points in the process to
> lower the pH of the ethanol processing fluid to a desired level. Whether, where
> and how much sulfuric acid to add at any particular point in the process varies
> from plant to plant and can depend on numerous factors that are specific to a
> particular plant, including the plant design, the specific compositions and
> ingredients of its ethanol processing fluid, and its operating procedures, including,
> e.g., whether the plant operator is using phytase additive to reduce the formation
> of insoluble deposits of phytic acid and/or salts of phytic acid.

DTX 2151.028 (U.S. Water's response to Request for Admission No. 34); Trial Tr. (October 16,

2017 pm) (rough) at 154:21–156:17 (U.S. Water's former CEO Allan Bly agreeing that this

response is correct).  And as to pH, U.S. Water similarly observed:

> Admitted that fuel ethanol plant operators, based on their specific plant operating
> needs and procedures, often do vary the pH of ethanol processing fluids across
> different components of a fuel ethanol plant. Whether, where and how much to
> vary pH, and what the target pH values are for any particular area of a plant varies
> from plant to plant and can depend on numerous factors that are specific to a
> particular plant, including the plant design, the specific compositions and
> ingredients of its ethanol processing fluid, and its operating procedures, including,
> e.g., whether the plant operator is using a phytase additive to reduce the formation
> of insoluble deposits of phytic acid and/or salts of phytic acid.

DTX 2151.029 (U.S. Water's response to Request for Admission No. 35); Trial Tr. (October 16,

2017 pm) (rough) at 156:17–157:12 (U.S. Water's former CEO Allan Bly agreeing that this

response is correct).

U.S. Water did not offer any evidence of how any of Novozymes' other customers

actually use Phytaflow®, the process conditions under which those plants operate while using the

product, or whether any of the limitations of the asserted claims are even met.  Indeed, U.S. Water has withdrawn its assertion that these other customers infringe the asserted claims requiring a pH of 4.5 or higher in the beer column (claims 1, 6, and 12 of the '137 patent, and claims 2, 15, and 18–20 of the '399 patent).  As for the remaining asserted claims, Mr. Dorn admitted that he had no data regarding sulfuric acid use for any plants other than the eight named plants.  Trial Tr. (Oct. 12, 2017 am) (rough) at 21:17–22:2.  Moreover, as described below, factors such as sulfuric acid addition and pH values in the beer column and elsewhere also vary from plant to plant.  Because every plant is different with respect to these operating conditions, it cannot be assumed that every plant that enjoys the reduction of formation of phytic acid deposits will also meet the "substantially without acid" limitations.  U.S. Water therefore needed to submit specific evidence for each plant to prove infringement.  *ACCO Brands*, 501 F.3d at 1313. It did not do so.  Accordingly, no reasonable jury could find that any of the unnamed plants directly infringe.

### 2.     U.S. Water Has Not Proved Direct Infringement by Any of the Named Plants

U.S. Water has similarly not met its burden of proving direct infringement of the asserted patents by any of the eight named plants.

#### a.     U.S. Water relies on plant data that pre-dates the issuance of the asserted patents

Most of the evidence on which U.S. Water relies pre-dates the issuance of one or both of the asserted patents.  *See* Trial Tr. (Oct. 12, 2017 am) (rough) at 13:12–18.  Mr. Dorn relied on data provided by Kansas Ethanol, Dakota Ethanol, and Calgren that was limited to use of Phytaflow® in 2012.  PTX 887, PTX 889 (pH and sulfuric acid usage for Kansas Ethanol from February to March 2012); PTX 884 (pH data for Dakota Ethanol from May 19, 2012 to July 31, 2012 and from November 5, 2012 to November 30, 2012); PTX 882, PTX 883 (pH data for

6

Calgren from December 1 to 21, 2012, and sulfuric acid data from April 12, 2012 to May 31, 2012). Mr. Dorn also relied on pH data and sulfuric acid data for Glacial Lakes – Mina that pre-dates the issuance of the '399 patent. PTX 885. While Mr. Dorn also testified that he relied on deposition clips for six plants from 2014 regarding how the plants operate, that testimony included evidence of the variability of plant operations over time, and Mr. Dorn has reviewed no data since the snapshot of data provided to him years earlier. Trial Tr. (Oct. 12, 2017 am) (rough) at 13:19–14:2, 14:6–10.

Mr. Dorn cannot reliably extrapolate from these pre-issuance uses of Phytaflow® that each plant met or continued to meet all of the specific process limitations of the asserted claims—specifically, the "pH 4.5 or higher" and "substantially without acid" limitations. The plant representative from Nesika testified regarding some of the possible changes that might affect the process, such as changes in the ingredients for the process, including changes in the composition of the corn (or other grain) and the water, which may require on-going adjustments to pH and sulfuric acid use in order to keep the plant running efficiently. Nesika Energy (Reynolds) Dep. Tr. at 104:14–105:14. And several of the plant representatives testified that one could not reliably use data relating to their plant operations from one period of time to draw conclusions about pH conditions during a different period of time. *Id*. at 127:14–129:14 ("You'd have to have data, but you can't – you just can't make assumptions to say – to guess what [the pH numbers] are, no."); Dakota Ethanol (Gerry) Depo. Tr. at 149:10–24 (testifying that one would need to reference plant data to determine pH values in the plant operations); Trial Tr. (Oct. 16, 2017 pm) (rough) 60:14–61:2 (Dr. Kohl explains that plants make decisions based on a number of variables); DTX 2151.028 (U.S. Water admits that whether, where, and how much sulfuric acid to add varies from plant to plant); Trial Tr. (October 16, 2017 pm) at 154:21–

7

156:17; DTX 2151.029 (U.S. Water admits that whether, where, and how much to vary pH and what the target pH values are for any particular area of a plant varies from plant to plant); Trial Tr. (October 16, 2017 pm) (rough) at 156:17–157:12.

U.S. Water failed to collect and present sufficient evidence needed for Mr. Dorn or other experts to evaluate whether these eight plants did or did not meet the "pH 4.5 or higher" claim limitation during the period of alleged infringement, *i.e.* after the asserted patents issued. Mr. Dorn simply assumed that the pH of the fluid entering the beer column, or the amount of sulfuric acid used by a plant, would remain the same from day to-day or from month-to-month or even year-to-year. And while U.S. Water introduced testimony from Kansas Ethanol and Dakota Ethanol that they continued to use Phytaflow® in the same manner—i.e. adding phytase to fermentation—after the time period for which they provided data, that testimony did not address whether the plants' *operating parameters*—including the pH in the beer column—remained the same. Kansas Ethanol (Combs) Dep. Tr. 85:19–86:12; Dakota Ethanol (Gerry) Dep. Tr. 145:13–24. Accordingly, no reasonable jury could find that Kansas Ethanol, Dakota Ethanol, Calgren, and Glacial Lakes Energy – Mina directly infringe.

**b.     Calgren and Dakota Ethanol do not practice the "pH 4.5 or higher" limitation**

U.S. Water's evidence demonstrated that at least two of the named plants, Calgren and Dakota Ethanol, *did not* meet the "pH of 4.5 or higher" limitation during certain periods of Phytaflow® usage for which they provided data. The "pH 4.5 or higher" limitation appears in all asserted claims of the '137 patent, and in claims 2, 16, and 18–20 of the '399 patent. In its summary judgment order, the Court construed this limitation to mean that "the pH must be 4.5 or higher at some point during production." Dkt. No. 561, Summary Judgment Order at 14. Not only does the data from these plants pre-date the issuance of both patents as described above, but

the plant data also indicates that both plants maintained a pH *below* 4.5 for the majority of the time that they were using Phytaflow®. PTX 884 (Dakota Ethanol maintained a maximum beer well pH of 4.44 from May 19–July 31, 2012, with an average beer well pH of 4.25 during that same time period, and an average pH of 4.48 from November 5–30, 2012); PTX 881 (Calgren maintained a maximum beer feed pH of 4.2 and an average beer feed pH of 3.65 from April 12–May 31, 2012). Importantly, Mr. Dorn admitted that plants "have the authority and flexibility to run" at whatever pH "was best for [plant] operation[s]." Trial Tr. (Oct. 12, 2017 am) (rough) at 16:7–11. Indeed, he also admitted that plants like Calgren and Dakota Ethanol can choose to operate with a pH in the beer column below 4.5 while using Phytaflow®. *Id.* at 15:8–19, 16:1–11. Accordingly, no reasonable jury could find that Calgren and Dakota Ethanol directly infringe the asserted claims of the '137 patent and claims 2, 16, and 18–20 of the '399 patent during the relevant time period.

### c.    None of the named plants meets the "substantially without acid" limitation

U.S. Water did not introduce evidence showing that *any* of the eight plants meets the claim limitation requiring deposit reduction being accomplished substantially by phytase. The limitation "wherein the reduction . . . is accomplished substantially without the addition of an acidic compound" appears in asserted claims 1, 5, and 7–9 of the '399 patent. DTX2002. In its summary judgment order, the Court construed this phrase to mean that "deposit reduction is accomplished *substantially by phytase* and *not by the addition of an acid compound with an oxidizer or with ultraviolet light*. But the term does not preclude all use of acidic compounds in ethanol processing." Dkt. No. 561, Summary Judgment Order at 16 (emphasis added). Mr. Dorn opined at trial that deposit reduction was accomplished substantially by phytase on the mere basis that "you add it, and the fouling is reduced, and they have a benefit." Trial Tr. (Oct.

11, 2017 pm) (rough) at 47:2–5.  Mr. Dorn effectively contends that one may conclude that Phytaflow® reduces deposits because the amount of sulfuric acid is reduced, and that therefore the Phytaflow® must be responsible substantially all of the deposit reduction.  *Id*. at 57:1–6.  That opinion merely assumes what Mr. Dorn and U.S. Water were required to prove.  But beyond that assumption, he offered no additional evidence.

Mr. Dorn admitted that many of the plants continue to use substantial amounts of sulfuric acid, in some cases thousands of pounds of acid per day while using Phytaflow®:  Calgren uses 1,028 gallons (about 8 tons) per day (PTX 883; Trial Tr. (Oct. 12, 2017 am) (rough) at 17:4–14), Kansas Ethanol uses 5,656 gallons (almost 3 tons) per day (PTX 889; Trial Tr. (Oct. 12, 2017 am) (rough) at 17:15–20), SWGE uses between 8,635–13,060 gallons (between 4 and 6.5 tons) per day (PTX 892; Trial Tr. (Oct. 12, 2017 am) (rough) at 17:21–25), and GLEM uses 168 gallons (about 1.25 tons) per day (PTX 885; Trial Tr. (Oct. 12, 2017 am) (rough) at 20:1–15).  Further, Mr. Dorn also admitted that he had no data whatsoever for sulfuric acid use at GLEW, Dakota Ethanol, Nesika, or Aemetis, and that he cannot testify regarding how much sulfuric acid these plants use per day.  Trial Tr. (Oct. 12, 2017 am) (rough) at 18:1–22.  But more importantly, Mr. Dorn did not show whether the reduction of deposits the plants enjoyed was accomplished "substantially by phytase."

Further, Mr. Dorn admitted that it is "very common practice" to add air to the fermenter or yeast propagator of fuel ethanol plants, and further that the oxygen in air is an oxidizer.  Trial Tr. (Oct. 11, 2017 pm) (rough) at 57:9–10; Trial Tr. (Oct. 12, 2017 am) (rough) at 11:19–22.  Mr. Dorn also testified that other oxidizers, such as hydrogen peroxide, sodium chlorite, and Fermasure (which acts as an oxidizer at pH of less than 5.5), are used in fuel ethanol plants.  Trial Tr. (Oct. 11, 2017 pm) (rough) at 59:10–12; Trial Tr. (Oct. 12, 2017 am) (rough) at 14:13–

17.  This testimony establishes that plants that continue to add sulfuric acid do so in the presence of an oxidizer.  As Mr. Dorn also admits that Phytaflow® is added to fermentation, U.S. Water cannot establish the "substantially without acid" limitation is met.  Trial Tr. (Oct. 12, 2017 am) (rough) at 12:15 –20.  Accordingly, U.S. Water has failed to show that reduction of deposits is being accomplished by all Phytaflow® customers, let alone at any of the eight named plants, *substantially by phytase*, and not by an acid in the presence of an oxidizer.

For these reasons, no reasonable jury could find that the named plants directly infringe.

### C.  U.S. Water Failed to Establish that Novozymes Induces Infringement of the Asserted Claims Under 35 U.S.C. § 271(b)

Even if U.S. Water proved direct infringement (which it did not), U.S. Water failed to otherwise prove that Novozymes actively induces infringement of the asserted claims.  "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002).  U.S. Water is also required to show that Novozymes (1) had knowledge of the asserted patents and (2) that it had knowledge that the third-party acts would directly infringe the asserted patents.[2]  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("*Global-Tech*"); *Commil USA, LLC v. Cisco Sys., Inc.*, __ U.S. __,135 S. Ct. 1920, 1927–28 (2015) (reaffirming its holding in *Global-Tech* that induced infringement requires knowledge of the asserted patent *and* the infringing nature of the accused act).  No reasonable jury could find that Novozymes specifically intended to encourage its customers to infringe or knew that they were infringing.

---

[2]  U.S. Water has dropped its contention that Novozymes was "willfully blind" to direct infringement by its Phytaflow customers.

U.S. Water did not introduce any evidence that Novozymes actively encourages its customers to infringe, *i.e.*, to practice every limitation of at least one of the asserted claims. *Limelight Networks*, 134 S. Ct. at 2117 ("A method patent claims a number of steps; under this Court's case law, the patent is not infringed unless all the steps are carried out."); *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1332 (Fed. Cir. 2005) ("Posting goods for sale . . . is relevant to only one limitation of the claims . . . .  There is no testimony or other record evidence that eBay intended to induce ReturnBuy to incorporate the other limitations of the asserted claims."), *vacated and remanded on other grounds*, 547 U.S. 388 (2006).  U.S. Water failed to meet its burden because Novozymes does not instruct its customers to practice specific process limitations of the asserted claims.

Novozymes' product application sheet for Phytaflow®, which is the company's approved recommendation for usage of the product, does not specify a pH or pH range for any portion of a plant's process, nor does it instruct that sulfuric acid should be reduced to the point that it ceases to play a substantial role in reduction of phytic acid deposits.  DTX 2240.  Indeed, testimony from Novozymes employees established that contrary to the claims in the asserted patents, Novozymes encourages its customers to continue adding sulfuric acid, and to target a lower pH. *See, e.g.*, Trial Tr. (Oct. 13, 2017 pm) (rough) at 50:1–11 (Steve Schnurrer testified that he always encourages his customers to add sulfuric acid); *id*. at 53:24–54:11 (Mr. Schnurrer recommends driving the pH down below 4.5).  The product application sheet does not suggest a temperature or a temperature range, and is silent about reaction time and process conditions.  Mr. Dorn admitted on cross examination that the product application sheet does not mention pH or a pH of 4.5, and it does not discuss the relative reduction in fouling by phytase as compared to sulfuric acid with an oxidizer.  Trial Tr. (Oct. 12, 2017 am) (rough) at 10:18–11:18.  Although

Novozymes encourages customers to use phytase to reduce deposits, it *only* instructs its customers on two points: to add Phytaflow® "in fermentation" and by providing a recommended dose range.  *Id.*; *see also* Trial Tr. (Oct. 13, 2017 pm) (rough) at 18:8–24, 19:6–23, 20:5–9, 20:15–18 (Jack Rogers testified that he reviewed the application sheet and Novozymes continued not recommending pH or sulfuric acid).  Dr. Kohl also testified that Novozymes only instructs customers on these two points.  Trial Tr. (Oct. 16, 2017 pm) (rough) 59:23–60:13.  As Dr. Kohl explained, plants "make decisions based on a number of variables that they have to control . . . they will choose more acid, less acid, higher pH, lower pH, different doses. . . . The plant is in charge of their operation and they make all those decisions of their own accord."  *Id*. at 60:14–61:2.  Plant representatives, including from Southwest Georgia Ethanol, Dakota Ethanol, and Aemetis, confirmed that Novozymes does not give instructions to the plants regarding how to run their operations.  These process conditions are determined individually by each plant.  *See, e.g.*, Southwest Georgia Ethanol (Ferman) Dep. Tr. 71:02-71:22 (describing variables that affect plant processes); *id*. at 201:2–15 (Southwest Georgia Ethanol decides how much sulfuric acid, sulfamic acid, and Phytaflow® to use, and decides the set point of the pH in the beer feed); Dakota Ethanol (Gerry) Dep. Tr. at 145:13–24 (Mr. Gerry regularly optimizes the process, makes dosage choices, adjusts pH targets, and adjusts sulfuric acid use); Aemetis (Hollis) Dep. Tr. at 118:11–19 (Aemetis makes its own decisions about how much acid to add); Calgren (Schlyer) Dep. Tr. at 180:1 –181:9 (Calgren determines how much sulfuric acid it will use, and Novozymes does not instruct Calgren on how to run its plant or how to use phytase); *see also* Trial Tr. (Oct. 11, 2017 pm) (rough) at 68:24 (Mr. Dorn testified that "Calgren was a little bit of a different animal.").

The only "teaching" in the application sheet cited by Mr. Dorn was the benefit of reduced sulfuric acid at distillation columns and evaporators. *Id.* at 49:20–50:17. But the asserted claims do not require merely a reduction in sulfuric acid usage. They require a pH of 4.5 or higher in the beer column, or they require that the reduction of deposits be accomplished substantially by the phytase and not by sulfuric acid with an oxidizer. The passage to which Dorn points is therefore insufficient. While Mr. Dorn also cites an instruction that "a pH target in the beer feed of 4.5 will be sufficient to prevent most fouling," customers should "step towards 4.1" should fouling persist, that instruction clearly cuts against U.S. Water. Trial Tr. (Oct. 11, 2017 pm) (rough) at 50:18–52:3; PTX 591 at NZ-USW00003005.

The testimony from plant representatives makes clear that Novozymes does not induce its Phytaflow® customers to practice two of the limitations that encompass all of the asserted claims. First, Phytaflow® customers have not been induced to target a pH of 4.5 or higher at some point during production, and, in any event, do not use any such target:

- **Nesika Energy** –Nesika Energy (Reynolds) Dep. Tr. at 93:6–14, 93:2–94:3 (Novozymes never provided instructions on use of Phytaflow®).

- **Aemetis** –Aemetis (Hollis) Dep. Tr. at 118:11–19 ("Q. Has Novozymes or any Novozymes' employee ever instructed or encouraged A[e]metis as to what pH its beer feed fluid should be when entering the beer column? A. Not that I am aware of. Q. Who makes decisions about what pH the fluid should be at [ ] that part of the plant? A. We do not make decisions on what the pH should be going to the beer well. We do not monitor that as a control point.").

- **Calgren** –Calgren (Schlyer) Dep. Tr. at 181:25–182:18 ("Q. Has any Novozymes representative ever told Calgren that the pH in its beer column should be 4.5 or higher when using a phytase? A. No. Q. And if someone from Novozymes had ever said that, how would that instruction be taken? How would that advice be received? A. Any advice we get from vendors is perhaps of interest if it's backed up by some particular reason . . . . But what would they know about pH in a beer column? They wouldn't – we wouldn't – they wouldn't comment on it; we wouldn't listen to it. Q. And Calgren makes these decisions for itself, in other words? A. We run our plant, that's correct.").

14

- **Southwest Georgia Ethanol** –Southwest Georgia Ethanol (Ferman) Dep. Tr at 196:15–17, 19 ("Q. Has Novozymes ever instructed or encouraged Southwest Georgia Ethanol to use a pH of 4.5 or higher in the beer column? A. Not to my recollection."); *id.* at 200: 9–10, 200:12 ("Q. Did you understand [Novozymes technical representative] Mr. Dancy to be suggesting that you use a pH range of 4.0 to 4.2 with Phytaflow®? A. Yes.").

- **Dakota Ethanol** –Dakota Ethanol (Gerry) Dep. Tr. at 165:12–19 ("Q. Has Novozymes or Novozymes' representative ever instructed or encouraged Dakota Ethanol as to what pH its processing fluid should be in the beer column? A. No. Q. Who makes decisions about pH targets in the Dakota Ethanol plant? A. I do."); *id.* at 139:11–13  ("Q. Did Novozymes ever give you a target for your beer well pH? A. No.").

Second, U.S. Water offered no evidence that Novozymes has encouraged its customers to achieve deposit reduction substantially by phytase, and not by the addition of sulfuric acid with an oxidizer.  DTX 2002 at asserted claims 1, 5, 6–13; *see, e.g.*, Southwest Georgia Ethanol (Ferman) Dep. Tr. at 200:14–16, 19 ("Q. Has Novozymes ever instructed or encouraged Southwest Georgia Ethanol to eliminate the use of acid in its ethanol production process? A. Not that I can recount."); Dakota Ethanol (Gerry) Dep. Tr. 165:05–11 ("Q. Has Novozymes or a Novozymes representative ever instructed or encouraged Dakota ethanol to eliminate the use of acid in its process? A. No.  Q: Who makes decisions about how much sulfuric acid Dakota should use – A. I do.").  If Novozymes has not *actively* induced customers to practice this "substantially without acid" limitation, U.S. Water cannot prevail on a theory of inducement for claims containing that limitation.  35 U.S.C. § 271(b) (requiring "active" inducement); *Global-Tech*, 563 U.S. at 760 (requiring "affirmative steps" to induce).  Accordingly, because Novozymes has not encouraged its customers to practice the "pH 4.5 or higher" limitation or the "substantially without acid" limitation, U.S. Water cannot prove it has induced any customer's infringement, as those two limitations together encompass all asserted claims.  DTX 2001; DTX 2002.

Moreover, like its direct infringement evidence, virtually all of the evidence U.S. Water relies on in support of its inducement claim concerns Novozymes' conduct *before* the asserted claims issued. *See, e.g.*, Anderson Dep. Tr. at 84:18–84:23, 85:21 to 85:25 (describing Novozymes dosage recommendations to Kansas Ethanol in 2011); Kansas Ethanol (Chisam) Dep. Tr. 36:01–36:14 (Novozymes employee Mike McKinzie told Kansas Ethanol in 2011 that Phytaflow® had "similar types of benefits" to pHytOUT); PTX 293 (March 5, 2012 email from Shannon Zhao to Lyle Schlyer at Calgren); PTX 294 (NS 50161 Phytase Trial Plan sent to Calgren on February 27, 2012); and PTX 296 (NS 50161 Phytase Trial Plane sent to GLEM on May 24, 2012). In fact, most of the conduct occurred when U.S. Water either had no patent rights whatsoever, or when its patent rights were limited to the addition of phytase after fermentation. *See Nat'l Presto Indus., Inc. v. W. Bend Co.,* 76 F.3d 1185, 1196 (Fed. Cir. 1996) ("We conclude that . . . as a matter of law § 271(b) does not reach actions taken before issuance of the adverse patent."); *Health Grades, Inc. v. MDX Med., Inc.*, No. 11-CV-00520- RM-BNB, 2014 WL 5762002, at *4 (D. Colo. Nov. 4, 2014) ("[A]s a matter of law there cannot be inducement or intent to induce if there is no patent at the time of the alleged inducement."); *see also State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) (reversing finding of willfulness based on copying, and noting that "[f]iling an application is no guarantee any patent will issue and a very substantial percentage of applications never result in patents. *What the scope of claims in patents that do issue will be is something totally unforeseeable*." (emphasis added)).

Accordingly, no reasonable jury could find that Novozymes actively induced infringement.

**D.    U.S. Water Has Not Proved that Novozymes Contributes to Infringement of the Asserted Claims Under 35 U.S.C. § 271(c)**

U.S. Water similarly failed to prove that Novozymes contributes to infringement of the asserted claims.  No reasonable jury could find that U.S. Water has met its burden of showing that Novozymes' accused phytase formulation is "a material or apparatus for use in practicing a patented process, . . . especially made or especially adapted for use in an infringement of such patent, and not a staple article . . . of commerce suitable for substantial noninfringing use[s]." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010) (quoting 35 U.S.C. § 271(c)).

**1.    The Phytase Formulation Sold by Novozymes Is a Staple Article of Commerce with Substantial Noninfringing Uses**

It is undisputed that phytase—i.e., the enzyme itself—is a staple article of commerce.[3] But the question of whether Novozymes contributes to any customer's infringement is different, as the concern of § 271(c) is the "the material actually sold by the accused and the uses made of it by its purchasers."  *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578–80 (Fed. Cir. 1987) (holding that for method claim requiring application of a toothpaste containing potassium nitrate, the toothpaste—not the potassium nitrate ingredient—is the proper focus of the analysis).  The "material" at issue here is not merely the phytase component of Phytaflow®, but rather the

---

[3]  For example, the specification of U.S. Water's asserted patents identifies at least three prior art uses of phytase that are substantial and noninfringing, including (1) increasing the bioavailability of phosphorus to livestock in distiller's grains; (2) increasing bioavailability of phosphorus to yeast in fuel ethanol production processes; and (3) improving the activity of alpha-amylase in fuel ethanol production processes.  DTX 2001 at 5:45-50; Trial Tr. (Oct. 12, 2017 am) (rough) at 23:2–7 ("Q. [to Mr. Dorn] And so you don't contest the fact that phytases like Novozymes' Ronozyme P had noninfringing uses outside of fuel ethanol and even within fuel ethanol, correct?  A. Right. . . ."); *see also* Trial Tr. (Oct. 16, 2017 pm) (rough) at 62:10–63:15 (Dr. Kohl discussing substantial noninfringing uses for phytase as described in the '137 patent).

phytase containing formulation sold by Novozymes under the brand name Phytaflow® for control of deposit formation in fuel ethanol production plants.

U.S. Water does not dispute that Novozymes has been selling the *identical* formulation used in Phytaflow® to animal feed producers under the brand name Ronozyme P-(L)® since 2007.  Rogers Dep. Tr. at 22:23–23:13, 42:14–43:22.Trial Tr. (Oct. 16, 2017 am) (rough) at 65:1–7.  It is undisputed that they are the same product with all of the same ingredients and components at the same concentrations.  *See also* Trial Tr. (Oct. 16, 2017 pm) (rough) at 148:13–16 (former U.S. Water CEO Allan Bly testified that U.S. Water's pHytOUT XP product contained Ronozyme P-(L)®); DTX 2502; DTX 2427 (U.S Water new product request for pHytOUT XP shows the phytase component Ronozyme P-(L)® is 8.5% of the formulation).  Given that Novozymes' phytase formulation is equally suited to use in animal feed application as it is to use in fuel ethanol plants to reduce phytate deposits, it also cannot be "especially made or especially adapted for use in an infringement" of U.S. Water's patents.

In addition, as a matter of law, any Phytaflow® use by a customer operating at a pH below 4.5 in the beer column, or in conjunction with an acid and an oxidizer, is a substantial noninfringing use.  As Mr. Dorn admitted, plants can and do choose to operate with a pH below 4.5 while using Phytaflow®, as evident even in the limited plant data submitted by U.S. Water.  PTX 884; PTX 881; Trial Tr. (Oct. 12, 2017 am) (rough) at 15:8–19, 16:1–11.

U.S. Water has not presented any evidence that these noninfringing uses are insubstantial, unusual, or impractical.  *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1338 (Fed. Cir. 2012).  U.S. Water contends, however, that Phytaflow® does not qualify as a "staple article" because it is not *marketed* for a purpose other than deposit control

and Novozymes' customers do not use it for any other purpose.[4]  As an initial matter, a "staple

article" under § 271(c) is an article having a substantial non-infringing use; there are not two

separate requirements.  *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670,

674–75 (Fed. Cir. 1990); *Universal Elec., Inc. v. Zenith Elec. Corp.*, 846 F. Supp. 641, 652 (N.D.

Ill. 1994) ("It seems clear from *C.R. Bard* that the Court must decide if Universal's remote

control units have any non-infringing uses.  If they do, those transmitters are staple articles and

Universal cannot be liable for contributory infringement by selling them.").  Moreover, U.S.

Water misunderstands the law of contributory infringement, and conflates the elements of

inducement with those of contributory infringement.

Section 271(c) creates liability for the sale of "a material . . . [that is] not a staple article

of or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c).

The focus of the statute is on "the thing" sold.  *See Hodosh*, 833 F.2d at 1578.  For contributory

infringement, the thing sold must not be "suitable" for substantial noninfringing use; there is no

requirement for a court to consider how the thing sold is marketed or how it is actually used by a

particular purchaser or subset of purchasers.  *Tyco Healthcare Grp. LP v. Biolitec, Inc.*, No. C-

08-3129 MMC, 2010 WL 3185497, at *5 (N.D. Cal. Aug. 11, 2010) (rejecting argument that

contributory infringement could be found based on allegation that defendant's marketing

"targets" vein doctors who "only use laser fibers for infringing endovenous ablation

procedures").

U.S. Water ignores the plain text of § 271(c) and focuses on *how* the Phytaflow product is

marketed, sold, and used, rather than *the thing* that is sold.  U.S. Water conflates the statutory

requirements for contributory infringement with the statutory requirements for inducement of

---

[4] U.S. Water concedes that phytase itself is a staple article.

infringement.  It has confused "contributory infringement," as codified in section 271(c) in the

1952 Patent Act, with "contributory infringement" under traditional common law principles

where it had a broader definition:

> The 1952 Act did not make a substantive change in the law of contributory
> infringement, but it divided the judicially created category of contributory
> infringement into two statutory subsections, section 271(b) (inducement of
> infringement) and section 271(c) (contributory infringement).  The most common
> type of pre–1952 contributory infringement cases were those in which "a seller
> would sell a component that was not covered by the claims of a patent but which
> had no other use except the claimed product or process."  That form of
> contributory infringement was codified in section 271(c).

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1358 (Fed. Cir. 2007); *see also*

*Global-Tech*, 563 U.S. at 761 ("Before 1952, both the conduct now covered by § 271(b)

(induced infringement) and the conduct now addressed by § 271(c) (sale of a component of a

patented invention) were viewed as falling within the overarching concept of 'contributory

infringement.'"); *Akamai Tech., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1309 (Fed. Cir.

2012) *rev'd on other grounds*, 134 S. Ct. 2111 ("Prior to the 1952 [Patent] Act, inducement and

contributory infringement were both referred to under the rubric of contributory infringement."

(citing Giles S. Rich, *Infringement Under Section 271*, 21 Geo. Wash. L. Rev. 521, 537 (1953)).

The Supreme Court's test for "substantial noninfringing use" under § 271(c) is whether

the material or apparatus sold is "good for nothing else."  *Metro-Goldwyn-Mayer Studios, Inc. v.*

*Grokster, Ltd.*, 545 U.S. 913, 932–35 (2005) ("*Grokster*") (explaining that the purpose of the

substantial noninfringing use rule of § 271(c) is to create a presumption of intent to cause

infringement when "an article is 'good for nothing else'"); *see also Dawson Chem. Co. v. Rohm*

*and Haas Co.*, 448 U.S. 176, 199 (1980) ("propanil is a nonstaple commodity which has *no use*

except through practice of the patented method" (emphasis added)); *Sony Corp. of Am. v.*

*Universal City Studios, Inc.*, 464 U.S. 417, 440–42 (1984) ("Unless a commodity 'has *no use*

except through practice of the patented method,' the patentee has no right to claim that its distribution constitutes contributory infringement.").

A defendant does not contribute to infringement by marketing a staple article for only one of its many uses.  In *Grokster*, the Supreme Court carefully distinguished contributory liability from inducement liability as follows:

> The classic case of direct evidence of unlawful purpose occurs when one ***induces commission of infringement by another***, or entices or persuades another to infringe, as by advertising. Thus at common law a copyright or patent defendant who ***not only expected but invoked infringing use by advertisement*** was liable for infringement on principles recognized in every part of the law. . . .
> The rule on inducement of infringement as developed in the early cases is no different today. Evidence of active steps taken to encourage direct infringement, ***such as advertising an infringing use or instructing how to engage in an infringing use***, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes ***the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use***, . . . .

545 U.S. at 935–36 (internal quotation marks, citations, and modifications omitted, emphasis added).

This important distinction is reflected in recent decisions of the Federal Circuit and other district courts that have considered similar questions under 271(c).  For example, in *In re Bill of Lading*, the Federal Circuit held that the patentee's contributory infringement claims could not survive a Rule 12(b)(6) motion to dismiss because the patentee had not adequately pled that "the components sold or offered for sale have no substantial non-infringing uses."  681 F.3d at 1337. The patentee argued that the accused products had been marketed in a particular (and allegedly infringing) way, but the Federal Circuit rejected that argument because the marketing-related allegations "say nothing more than 'if you use this device to perform the patented method, the device will infringe and has no noninfringing uses.'"  *Id.* at 1338 ("Where the product is equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses, a

21

claim for contributory infringement does not lie.").  By comparison, the Federal Circuit allowed

the patentee's *inducement* claims based on the marketing-related allegations.  *Id.* at 1341

(allowing claims against defendant DriverTech based on "advertising"), 1342 (same for

defendant ACS), 1343 (same for defendant PeopleNet), 1344 (same for defendant Intermec),

1345 (same for defendant Microdea), 1345–46 (same for defendant Qualcomm).

Similarly, in *Tyco Healthcare Grp. LP v. Biolitec, Inc.*, the district court granted

summary judgment of no contributory infringement where the patentee conceded that the article

sold was capable of substantial noninfringing uses, but nevertheless argued that the defendant's

marketing "targets" vein doctors who "only use laser fibers for infringing endovenous ablation

procedures."  2010 WL 3185497, at *5.  This argument is very similar to the one U.S. Water

suggests here—*i.e.*, that Novozymes markets the accused formulation to fuel ethanol production

plants and the plants use the formulation to reduce the formation of phytic acid deposits.  The

*Tyco* court rejected this argument:

> The evidence on which [the patentee] relies may be relevant to establishing a
> claim of inducement pursuant to 35 U.S.C. § 271(b).  *See Grokster*, 545 U.S. at
> 936–37 (describing "inducement rule" in patent law as "one who distributes a
> device with the object of promoting its use to infringe ... is liable for the resulting
> acts of infringement by third parties"); *Hewlett Packard Co. v. Bausch & Lomb
> Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (noting scope of activities prohibited
> by § 271(b) is "much broader" than scope prohibited by § 271(c)). [The
> patentee], however, cites no case, and the Court has located none, holding that
> where a defendant sells a "staple article," *see* 35 U.S.C. § 271(c), to a narrow
> clientele which, in turn, does not use the product to engage in noninfringing
> activities, the defendant has engaged in contributory infringement.

*Id*.

In both *Tyco* and *In re Bill of Lading*, no theory of contributory infringement could

succeed because the articles sold were *capable* of substantial noninfringing use.  The advertising

and "actual use" evidence presented by the patentee was directed to inducement, not contributory

infringement.  Likewise in this case, it is undisputed that the accused Phytaflow®/Ronozyme®
P-(L) enzyme formulation is suitable for substantial noninfringing uses.

> **2.     U.S. Water Has Failed to Prove Specific Intent to Contribute to Infringement or that Novozymes Knew Its Customers Were Infringing**

U.S. Water failed to offer sufficient evidence proving Novozymes intended to contribute
to infringing acts by its Phytaflow® customers for the same reasons described above with respect
to the active inducement claim.[5]  *See* § II.C.1, *supra*; *see also Commil*, 135 S. Ct. at 1927
(explaining that "the mental state imposed" for contributory infringement and induced
infringement are "similar").  U.S. Water similarly failed to establish that Novozymes knew that
the induced acts constitute patent infringement.  *See* § II.C.2, *supra*.

For the foregoing reasons, no reasonable jury could find that Novozymes contributes to
infringement.

### III.    CONCLUSION

For the foregoing reasons, Novozymes respectfully requests that this Court grant its
motion for judgment of non-infringement as a matter of law.

---

[5]  U.S. Water has dropped its contention that Novozymes was "willfully blind" to direct
infringement by its Phytaflow® customers.

Dated:  October 18, 2017                    Respectfully submitted,

                                            FENWICK & WEST LLP


                                            By: *s/Ewa M. Davison*
                                                David K. Tellekson (admitted *Pro Hac Vice*)
                                                dtellekson@fenwick.com
                                                Ewa M. Davison (admitted *Pro Hac Vice*)
                                                edavison@fenwick.com
                                                Elizabeth B. Hagan (admitted *Pro Hac Vice*)
                                                ehagan@fenwick.com
                                                FENWICK & WEST LLP
                                                1191 Second Avenue, 10th Floor
                                                Seattle, WA  98101
                                                Telephone:      (206) 389-4510
                                                Facsimile:      (206) 389-4511

                                                Virginia K. DeMarchi (admitted *Pro Hac Vice*)
                                                vdemarchi@fenwick.com
                                                FENWICK & WEST LLP
                                                801 California Street
                                                Mountain View, CA  94041
                                                Telephone:      (650) 988-8500
                                                Facsimile:      (650) 938-5200

                                                Amy E. Hayden (admitted *Pro Hac Vice*)
                                                ahayden@fenwick.com
                                                Hailey Teton (admitted *Pro Hac Vice*)
                                                hteton@fenwick.com
                                                FENWICK & WEST LLP
                                                555 California Street
                                                San Francisco, CA 94104
                                                Telephone:      (415) 875-2300
                                                Facsimile:      (415) 281-1350

                                                Allen A. Arntsen
                                                aarntsen@foley.com
                                                FOLEY & LARDNER LLP
                                                Verex Plaza
                                                150 East Gilman Street
                                                Madison, WI  53703
                                                Telephone:      (608) 257-5035
                                                Facsimile:      (608) 258-4258

                                                *Attorneys for Defendants Novozymes A/S*
                                                *and Novozymes North America, Inc.*